## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 09-21723-CIV-MOORE

VALENTINE B. ANDELA,

      Plaintiff,

vs.

UNIVERSITY OF MIAMI, et al., UNIVERSITY OF
NORTH CAROLINA AT CHAPEL HILL, et al.,

      Defendants.

_____/

## ORDER GRANTING IN PART UNIVERSITY OF MIAMI'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT; GRANTING IN PART UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant University of Miami's Motion to Dismiss or, in the Alternative, for Summary Judgment (dkt # 14) and Defendant University of North Carolina at Chapel Hill's Motion to Dismiss or, in the Alternative, for Summary Judgment (dkt # 25). Plaintiff filed Responses (dkt #'s 24, 31) and Defendants filed Replies (dkt #'s 28, 38).

UPON CONSIDERATION of the Motions, the Responses, the Replies, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## I.   BACKGROUND

This case arises out of *pro se* Plaintiff Valentine B. Andela's ("Andela") employment with Defendant University of Miami ("UM") and his subsequent termination. Andela is a physician-scientist from Cameroon, Africa, whose area of study is translational cancer research and international technology transfer to Africa. Andela was employed by UM from June of 2005 to September 25, 2006, as a post-doctoral associate in the Viral Oncology program at UM's

Sylvester Comprehensive Care Center (the "Sylvester Center"). Throughout his employment as a post-doctoral associate, Andela worked in the laboratory of Dr. William J. Harrington, Jr. ("Harrington"). Andela was also enrolled in UM's Master of Art in International Administration ("MAIA") program from January of 2006 to October of 2007.

      A.    Andela's Employment with UM

Andela is an internationally recognized cancer researcher who is black and a native of Cameroon. ALJ Recommended Order at 6 (dkt # 14-8); see also Am. Compl. ¶ 2. In 1999, he received his Ph.D. from the University of Yaounde I in Cameroon. ALJ Recommended Order at 7 (dkt # 14-8). Andela spent the next five years working as a post-doctoral fellow at the University of Rochester Medical Center in Rochester, New York. Id. In June of 2005, Andela began working as a post-doctoral associate in the Viral Oncology Program at the Sylvester Center. Id. The Sylvester Center serves as the hub for cancer-related research, diagnosis, and treatment at UM's School of Medicine. Id. Harrington was in charge of the Viral Oncology program throughout Andela's employment and ran a cancer-research laboratory focused on the therapeutic targeting of NFkappaB signaling in Epstein Barr Virus related to Burkitt's Lymphomas and developing international research programs. Id. at 9. Harrington's lab was funded entirely by research grants including grants from the National Institutes of Health ("NIH"), the Leukemia Society, and the State of Florida. Id.

In June of 2005, Harrington personally interviewed Andela and offered him a post-doctoral position in his lab. Id. at 10. As a post-doctoral associate, Andela was the "senior lab person" working under Harrington's supervision. Id. Andela alleges that he "accepted the position of a post-doctoral associate with the understanding that he would be moving up to an independent (faculty) position within a year - which is standard expectation of someone with over 5 years of successful post-doctoral experience - and would be pursing his primary interest in

translational cancer research (targeted therapeutics of NfkappaB signaling in cancer) and international development and technology transfer to Africa." Am. Compl. ¶ 35. Harrington and Andela initially enjoyed a cordial working and social relationship. ALJ Recommended Order at 10 (dkt # 14-8).

During the first several months of his employment, Andela engaged in research involving NFkappaB signaling. Id. at 12. Harrington was impressed with Andela's work in the lab and with an article Andela had published in the East African Medical Journal. Id. Andela also contributed to the preparation of a successful NIH grant submitted by Harrington on September 1, 2005. Id. The NIH grant involved funding for a project in collaboration with researchers in Brazil and at the University of North Carolina at Chapel Hill ("UNC"). Id. The project involved research on Burkitt's Lymphomas, Epstein Barr virus, and their relationship to NFkappaB. Id. at 13. The grant application was based on work that was done prior to Andela's employment under Harrington. Id. Listed as key personnel on the grant application were: Harrington; Iguaracyra Aruajo, M.D., of Brazil; Jose Barreto, M.D., of Brazil; Carlos Brites, M.D., Ph.D., of Brazil (collectively, the "Brazilian Investigators"); Dirk Dittmer, Ph.D., of UNC ("Dittmer"); and Isildinha Reis, Ph.D., of UM. Id. Also included on the grant was a statement made concerning the anticipated role of Andela in the project. Id. The statement indicated that Andela would be in charge of the day-to-day aspects of Harrington's work including receiving research samples shipped from Brazil and forwarding them to Dittmer at UNC, performing cell cultures, preparing DNA and RNA, and analyzing other research samples. Id. at 14.

Andela alleges, however, that the NIH grant also incorporated a commitment between Harrington's lab and researchers in Cameroon. Am. Compl. ¶ 37. Andela alleges that sometime between July and August 2005, a commitment was made between himself, Harrington, the chair and vice-chair of the national cancer control program in Cameroon, and the vice dean in-charge of research and international cooperation at the University of Yaounde I, to collaborate and

develop an international research program on Burkitt's Lymphoma. Id. Andela further alleges

that Harrington represented to him that the NIH grant application incorporated the research

commitments in Cameroon and that once the funding came through, Andela would independently

develop the research program in Africa and would receive a faculty position and a dedicated

research technician. Id.

In the fall of 2005, Harrington and Andela discussed the prospect of Andela researching

Epstein-Barr virus ("EBV") microRNAs, a novel area of research. ALJ Recommended Order at

14 (dkt # 14-8). With Harrington's approval, Andela began researching EBV microRNAs, a

project that consumed most of his work time during his employment with UM. Id. Andela's

project included helping draft a manuscript detailing the findings of his research. Id. In

November of 2005, Andela advised Harrington that he was considering participating in a clinical

residency program at UM's Jackson Memorial Medical Center ("Jackson Memorial"). Id. at 15.

Harrington wrote Andela a letter of recommendation praising him for exceeding expectations and

personally called Stephen Symes, M.D. ("Symes"), who was the head of Jackson Memorial's

staff program at the time, to recommend Andela. Id. Andela planned to participate in a two-

week clinical rotation at Jackson Memorial in December of 2005 but decided not to because the

EBV microRNA research project he had undertaken was consuming all of his time. Id.

Harrington was pleased with Andela's work on the EBV microRNA research project and gave

Andela an overall rating of "exceeds standards" in his annual performance evaluation on March

20, 2006. Id. at 16. Andela received a rating of "exceeds standards" in all but one category: time

management. Id. In the time management category, Andela received a rating of "meets

standards" along with a comment by Harrington that stated: "I would like him to maintain more

regular hours but his work is outstanding." Id. Harrington included this comment in his review

because he felt there were issues regarding Andela's disappearing for long periods of time from

Harrington's lab without explanation. Id. Harrington felt Andela's absences were becoming

4

problematic. Id.

In the Spring of 2006, Andela's unexplained absences from Harrington's lab continued and their relationship quickly deteriorated. Id. at 17. Andela's absences prompted several unpleasant email exchanges between Harrington and Andela. Id. at 17-22. Andela also alleges, however, that during the month of April, Harrington "repeatedly used demeaning and offensive language and made disparaging remarks vis-a-vis [Andela] including negative stereotypes and expletives general[ly] associated with the unfavorable geopolitical standing of Africa(ns)." Am. Compl. ¶ 51. On May 12, 2006, following one of Andela's unexcused absences, Harrington spoke with Andela and provided him with verbal instructions regarding his attendance. ALJ Recommended Order at 22 (dkt # 14-8). Also on May 12, Harrington sent an email to Desiree Uptgrow ("Uptgrow") of the Sylvester Center's Human Resources Office, informing her of the instructions he had provided to Andela and his intention to fire Andela if Andela's behavior did not conform to his instructions. Id. at 22-23.

On June 1, 2006, Harrington submitted a manuscript detailing research on EBV microRNA (the "First Manuscript") to the medical journal *Blood*. Id. at 23-24. Andela was listed as first author and Harrington and the Brazilian Investigators were also listed as authors. Id. at 24. While Andela disagreed with including the Brazilian investigators as authors, Harrington felt that they clearly deserved to be co-authors and that it would be unethical not to include them. Id. Andela also alleges that Dittmer "made tortious objections on [Andela's] draft manuscript such as vetoing the entire discussion section, stating 'I DON'T BELIEVE THE DISCUSSION.'" Am. Compl. ¶ 56. The First Manuscript was ultimately rejected for publication in *Blood*. ALJ Recommended Order at 24 (dkt # 14-8).

On July 20, 2006, Harrington sent a second email to Uptgrow concerning further instances of Andela's unexcused absences and what Harrington deemed as insubordinate conduct by Andela. Id. Specifically, Harrington noted that Andela had refused to conduct an experiment

that Harrington had asked him to set up, although Andela disputes this assertion. Id. at 24-25. Later on July 20, 2006, Uptgrow sent an email to Nicole Lergier ("Lergier") and Lynette Jackson of the Human Resources Office advising them of Harrington's desire for assistance in the termination of Andela based on his failure to follow instructions. Id. at 25. On July 24, 2006, in another exchange of emails between Andela and Harrington, Andela informed Harrington that he intended to take a month off from Harrington's lab in August to do a clinical rotation at Jackson Memorial. Id. at 27. Andela intended to take a short vacation to Europe beginning on August 6, 2006, to prepare for his two-week clinical rotation at the end of August. Id. Harrington made it clear to Andela that he was not aware of Andela's vacation plans but nonetheless, even though he was not obligated to do so, he would make sure that Andela was paid for the two-week clinical rotation, after his vacation in Europe. Id.

On August 5, 2006, Andela left UM and went to Russia for a two-week "short course" at the School of International Relations in St. Petersburg, Russia, with a group of students and faculty of the MAIA program. Id. at 28; Am. Compl. ¶ 70. Andela received three credits for the "short course" towards his MAIA degree at UM. ALJ Recommended Order at 28 (dkt # 14-8). Andela returned from Europe on August 18 or 19, 2006, and stayed home to rest until returning to work at Harrington's lab on September 8, 2006. Id. Andela never participated in the two-week clinical rotation but was nonetheless paid by UM for the two weeks he represented he was going to be participating in the rotation. Id. Andela failed to tell Harrington that he did not participate in the rotation. Id. Harrington, meanwhile, had contacted Symes, who was running the clinical rotation at Jackson Memorial, to check if Andela ever showed up for the rotation. Id. at 28-29. Symes told Harrington that Andela had not shown up for the rotation. Id. at 29. When Andela showed up for work on September 8, 2006, Harrington asked him to provide documentation that he had participated in the clinical rotation at Jackson Memorial during the time he had been away. Id. Andela told Harrington that he did not have any documentation and

Harrington understood that Andela told him he had done a clinical rotation in Rochester.  Id.
When Harrington asked Andela for documentation of his clinical rotation in Rochester, Andela
again told Harrington that he did not have any documentation.  Id.  Immediately thereafter,
Harrington told Andela to leave the lab and informed Andela that he would bring the matter to
the attention of Human Resources.  Id.  Harrington considered Andela's absence without
participating in the clinical rotation an abandonment of Andela's job and a continuation of
Andela's disregard for his supervisory authority.  Id.

     Following Andela's dismissal from Harrington's lab, Harrington emailed the Human
Resources Office informing them that Andela was not allowed back in Harrington's lab under
any circumstances, and that he was effectively dismissed from his job at the lab.  Id. at 30.
Lynetta Jackson of the Human Resources Office responded to Harrington's email informing
Harrington that UM had to follow a process when terminating employees, that all terminations
must go through an approval process, and that Lergier or Karen Stimmel would follow up on the
matter.  Id.  Lergier followed up on the matter and met with Andela on September 14, 2006.  Id.
at 31.  Lergier informed Andela that Harrington had requested his termination because he had
taken several weeks off in August without participating in the clinical rotation and that
Harrington considered Andela's conduct to be job abandonment and grounds for immediate
termination.  Id.  Lergier also informed Andela that the purpose of their meeting was to give
Andela a chance to tell his side of the story and bring forward any issues.  Id.  Andela defended
himself and countercharged that Harrington had been abusive, manipulative, and unprofessional.
Id.  At no time during their meeting did Andela complain to Lergier that Harrington was
prejudiced against him because he was black or because he was from Cameroon.  Id.  Andela
indicated to Lergier that he had no intention of going back to Harrington's lab but that he wanted
the EBV microRNA Manuscript to be published.  Id.  After the meeting with Lergier ended,
Andela followed up with an email to Lergier to which he attached previous emails between

himself and Harrington that he felt documented Harrington's inappropriate conduct. Id. at 32. On September 20, 2006, Andela was contacted by Uptgrow and given the option of resigning his position in Harrington's lab or being terminated. Id. at 34. Andela refused to resign. Id. On September 25, 2006, Harrington sent Andela a letter informing him that his employment was terminated effective immediately. Id.

### B.      The Manuscript Dispute

Prior to Andela's termination, Harrington had emailed Andela on September 14, 2006, to inform him that the EBV microRNA Manuscript would be submitted again to *Blood* with Andela as first author and that he would send Andela a draft prior to its submission. Id. Harrington subsequently submitted a revised version of the First Manuscript (the "Revised Manuscript") to *Blood*. Id. The Revised Manuscript was, Harrington believed, shorter but not substantially different from the First Manuscript. Id. at 33. Harrington thought it was only fair to keep Andela listed as first author because Andela had done most of the lab work for the First Manuscript and he did not believe his actions were contrary to Andela's interests or desires. Id. Ultimately, the Revised Manuscript was also rejected for publication in *Blood*. Id. Although Andela was listed as first author, he had not signed off on and had not seen the Revised Manuscript before its submission to *Blood*. Id. At some point after its submission, Andela received an emailed copy of the Revised Manuscript from Harrington. Id. A day after Andela received the emailed copy, he ran into Harrington on UM's campus and expressed his displeasure with Harrington putting Andela's name as first author on a paper he felt he didn't write and that he didn't sign off on. Id. Andela also told Harrington to take his name off of the Revised Manuscript. Id. Harrington subsequently took Andela's name off the Revised Manuscript and submitted it to another medical journal entitled *Cancer Research* sometime in late 2007. Id. *Cancer Research* accepted the Revised Manuscript and published it in March 2008. Id.

8

C.      The Diploma and Car Dispute

After his termination from Harrington's lab, Andela focused on completing the requirements necessary to obtain his MAIA degree at UM. Id. at 35. In accordance with UM's policy, as an employee of UM, Andela continued to received tuition remission benefits for the 2006 fall semester. Id. Once the 2006 fall semester ended, his tuition benefits were terminated because he was no longer employed by UM. Id. Andela believed that he had completed the requirements for his MAIA degree and was, therefore, entitled to receive his diploma and final transcript. Id. at 36. UM's records, however, indicated that Andela had not received credit for the Practicum in International Administration course that he needed to obtain his MAIA degree. Id. The Practicum required Andela to write and defend a thesis. Id.

Andela was working on his thesis in the Spring of 2007 when his car, which was parked on UM's campus, was ticketed by the City of Coral Gables police and subsequently towed. Id. Andela attempted to retrieve his car but was unable to do so and demanded that UM compensate him for his loss. Id. Andela and UM engaged in settlement negotiations and, as early as August 8, 2007, UM insisted that as a condition of its agreement to any settlement, Andela sign a full and general release. Id. This release required Andela, in exchange for a settlement, to waive any causes of action relating to his employment or separation from employment with UM and relating to his status as a student at UM. Id. at 36-37. On September 13, 2007, Andela filed an Employment Complaint of Discrimination ("FCHR Complaint") with the Florida Commission on Human Relations ("FCHR"). Id. at 37-38. On September 22, 2007, Andela sent a letter to UM's General Counsel, Judd Goldberg ("Goldberg"), informing Goldberg that he would not sign the release and that UM's request for him to do so was an act of retaliation based on his FCHR Complaint. Id. at 38. Goldberg responded to Andela's letter on September 24, 2007, and stated that UM did not believe that the settlement and release agreement was retaliatory because it was provided to Andela before he filed his FCHR Complaint. Id.

D.   Andela's Administrative and State Law Litigation

1.   The FCHR Complaint

Andela's FCHR Complaint alleged that UM committed race and national origin discrimination in violation of Title VII and the Florida Civil Rights Act ("FCRA"). FCHR Complaint at 2 (dkt # 14-2). In his FCHR Complaint, Andela alleged: (1) that Harrington treated him in a prejudiced and unprofessional manner; (2) that he went to Human Resources at UM to express his concerns with Harrington's handling of a research article of which he was lead author; (3) that he was terminated from his employment with UM with no explanation and that Harrington had undue influence in his termination; (4) that had he been white or of a predominately white nation of origin he would not have been treated distastefully by Harrington or terminated from employment; and (5) that Harrington attempted to publish a "bogus" research article listing him as lead author in an attempt to harm his reputation and disrupt his future employment status. Id. On September 19, 2007, the FCHR sent Andela a Notice of Receipt of Complaint notifying Andela that his FCHR Complaint had been received and that it had been dual filed with the United States Equal Employment Opportunity Commission ("EEOC"). Notice of Receipt of Complaint, UM Mot. Ex. C at 2 (dkt # 14-3). The Notice of Receipt of Complaint also informed Andela that the FCHR would investigate his claim within 180 days of the Notice. Id. The FCHR also notified UM that Andela had filed a charge of employment discrimination against them, that the FCHR Complaint had been dual filed with the EEOC, that the matter would be investigated by the FCHR, and that the EEOC would consider all facts and evidence from the FCHR investigation. Notice of Charge of Discrimination at 2 (dkt # 14-4).

The FCHR conducted an investigation and on February 7, 2008, it determined that "there is no reasonable cause to believe that an unlawful employment practice occurred." Notice of Determination: No Cause at 2 (dkt # 14-5). The Notice of Determination advised Andela of his right to request an administrative hearing by filing a Petition for Relief ("Petition"). Id. Andela

filed a Petition on March 2, 2008. Petition for Relief (dkt # 14-6). While Andela did not assert a claim for retaliation in his FCHR Complaint, Andela's Petition cited a claim for retaliation in addition to charges of race and national origin discrimination. See id. Andela also made allegations of improper conduct by Harrington concerning the submission of the EBV microRNA Revised Manuscript to *Blood* and of improper conduct by UM concerning his MAIA diploma and the towing of his car from the UM campus. Id. at 10-11. The FCHR transmitted Andela's Petition to the Division of Administrative Hearings ("DOAH"), and requested that the DOAH assign the matter to an Administrative Law Judge ("ALJ") to conduct all necessary proceedings and submit recommended findings to the FCHR. Transmittal of Petition at 2 (dkt # 14-7).

> 2.    ALJ Hearing and Recommended Order

Andela and UM engaged in discovery and, on May 22, 2008, the ALJ conducted an evidentiary hearing on Andela's claims by video teleconference. ALJ Recommended Order at 5 (dkt # 14-8); see also Final Order Dismissing Petition for Relief from an Unlawful Employment Practice at 2 (dkt # 14-10). Three witnesses testified at the hearing: Harrington, Andela, and Lergier. ALJ Recommended Order at 6 (dkt # 14-8). In addition, sixty-seven exhibits were introduced and received into evidence, including five by Andela and sixty-two by UM. Id. At the close of the hearing, the ALJ advised Andela and UM that they had fourteen days in which to file proposed recommended orders. Id. Both Andela and UM filed proposed recommended orders. Id.

Based on the evidence presented at the hearing, and on the record as a whole, the ALJ found "no act of race or national origin-based discrimination committed by [UM] against [Andela] at any time." Id. at 56. The ALJ went on to note that although Andela claims Harrington fired him because of his race and national origin, Harrington was, in fact, the same person who hired Andela knowing he was black and from Cameroon. Id. at 57. While Harrington and Andela's relationship deteriorated over time, it was not "because of anything to

11

do with [Andela's] race or national origin" but was instead due to what Harrington "viewed as [Andela's] continuing lack of respect for [Harrington's] authority as his supervisor." Id. In regards to Andela's claims for retaliation in his Petition for Relief, the ALJ found that there was no evidence to support a connection between the filing of Andela's FCHR Complaint and the alleged retaliatory acts. Id. at 60.

> 3.   FCHR Dismissal, EEOC Dismissal, and Florida Third Circuit Court of Appeals Affirmance

On October 2, 2008, the FCHR held public deliberations by telephone on Andela's exceptions to the ALJ's Recommended Order. On October 9, 2008, the FCHR issued a Final Order Dismissing Petition for Relief from an Unlawful Employment Practice ("FCHR Final Order"). Final Order Dismissing Petition for Relief from an Unlawful Employment Practice at 2 (dkt # 14-10). The FCHR Final Order held that the ALJ's findings of fact were supported by "competent substantial evidence" and the ALJ's "application of the law to the facts" resulted "in a correct disposition of the matter." Id. at 2-3. The FCHR Final Order also rejected Andela's exceptions to the ALJ Recommended Order and dismissed his FCHR Complaint with prejudice. Id. at 3.

Andela appealed the FCHR Final Order to the Third District Court of Appeals and on March 25, 2009, the Third District affirmed, *per curiam*, the FCHR's decision. Order Affirming, Case No. 3D08-2825, at 2 (Fla. 3d Dist. Ct. App. 2009) (dkt # 14-11). On March 31, 2009, the EEOC issued a Dismissal and Notice of Rights in which it adopted the findings of the FCHR and notified Andela of his right to file a lawsuit under federal law. EEOC Dismissal and Notice of Rights at 2 (dkt # 14-12). Andela, however, continued to pursue his appellate avenues by filing a motion seeking clarification, certification, and a written opinion, which the Third District Court of Appeals denied on April 16, 2009. Order Denying Motion for Clarification, Case No. 3D08-2825, at 2 (Fla. 3d Dist. Ct. App. 2009) (dkt # 14-13). The Mandate of the Third District opinion

issued on May 6, 2009.  Mandate, Case No. 3D08-2825, at 2 (Fla. 3d Dist. Ct. App. 2009) (dkt #
14-14).

In addition to pursing his appellate avenues, Andela also filed a Pre-Suit Notice of Tort
Claims, pursuant to § 768.28(6)(a), Florida Statutes, against the FCHR and the DOAH for
"manifest negligence and willful, wanton, malicious conduct" in the handling of Andela's
discrimination charge against UM.  Pl. Resp. at 23.  On June 23, 2009, the Florida Department of
Financial Services found that the State of Florida bore no legal liability for Andela's tort claims
due to sovereign immunity.  Id. at 91.

     E.    The Instant Complaint

On June 22, 2009, Andela filed the instant Complaint (dkt # 1) and on August 19, 2009,
Andela filed an Amended Complaint (dkt # 32).  His Amended Complaint asserts claims for
breach of duty based on special relationship of mutual benefit (Claim 1); tortious breach of
special relationship (Claim 2); promissory estoppel (Claim 3); misrepresentation, fraud and
conspiracy to defraud (Claims 4, 8 & 15); violation of Sections 1 and 2 of the Sherman Antitrust
Act (Claims 5, 11 & 19); unlawful discrimination and retaliation in violation of Title VI and VII
(Claims 6, 14, 17, 18, 20 & 21 ); breach of covenants of employment (Claim 7); tortious
interference, constructive fraud, and abuse of privileged relationship (Claim 9); breach of
contract and breach of duty based on a special relationship of mutual benefit (Claim 10);
intentional infliction of emotional distress (Claim 12); negligent supervision and retention (Claim
13); violation of 42 U.S.C. §§ 1981, 1983 and 1985 (Claims 14 & 23); willful violation of
Section 43 of the Lanham Act (Claims 16 & 22); and violation of the Racketeer Influenced and
Corrupt Organizations Act ("RICO") (Claim 24).  Although Andela asserts new federal claims
against UM, the factual bases for his Amended Complaint are the same as in his FCHR
Complaint and Petition for Relief.  Andela now also asserts claims against the University of
North Carolina at Chapel Hill ("UNC").  UM filed its Motion to Dismiss or, in the Alternative,

for Summary Judgment (dkt # 14), on August 24, 2009, arguing for summary judgment to the extent that Andela's claims are barred by the doctrines of res judicata and collateral estoppel. UM further argues that to the extent Andela's claims are not barred, they fail to state a claim upon which relief can be granted.  UNC also filed a Motion to Dismiss or, in the Alternative, for Summary Judgment (dkt # 25), on September 15, 2009, adopting UM's Motion to the extent it requests summary judgment and also asserting that Andela's claims against UNC fail to state a claim upon which relief can be granted.  Andela filed a Response (dkt # 24) to UM's Motion on September 11, 2009, arguing that UM's reliance on res judicata and collateral estoppel were improper because the state administrative and judicial proceedings were "null and void" due to "lack of personal jurisdiction, subject matter jurisdiction (everything but the Title VII claims) and overarchingly, plain usurpations of power which constitute violations of due process."  Pl. Resp. at 4.  Andela's Response also argued that each of his Counts sufficiently alleged a claim upon which relief can be granted.  Andela also filed a Response (dkt # 31) to UNC's Motion asserting similar arguments.  In light of the Parties' submissions of evidence along with their pleadings, this Court issued an Order converting UM and UNC's Motions to Dismiss into Motions for Summary Judgment with respect to their arguments on res judicata and collateral estoppel.[1] Notice of Conversion to Summary Judgment, dated Jan. 12, 2010 (dkt # 58).

---

[1]Because the Parties submitted extensive evidence of the administrative and state proceedings in this action, the Court converted UM and UNC's Motions to Dismiss into motions for Summary Judgment with respect to their arguments asserting res judicata.  Papa John's Intern, Inc. v. Cosentino, 916 So. 2d 977, 983 (Fla. 4th Dist. Ct. App. 2005) (holding that a court may not take judicial notice of separate legal proceedings on a motion to dismiss and defenses of res judicata and collateral estoppel must be resolved through motion for summary judgment). Moreover, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court gave the Parties ten days in which to supplement the record.  Trustmark Ins. Co. v. ESLU, Inc., 299 F.3d 1265, 1267 (11th Cir. 2002) (citation omitted).

## II.    STANDARD OF REVIEW

### A.    Summary Judgment

The applicable standard for reviewing a summary judgment motion is unambiguously

stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a
> matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss

v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994).  The moving party has the burden of meeting this

exacting standard.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  An issue of fact is

"material" if it is a legal element of the claim under the applicable substantive law which might

affect the outcome of the case.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the

nonmoving party.  Id.

In applying this standard, the district court must view the evidence and all factual

inferences therefrom in the light most favorable to the party opposing the motion.  Id.  However,

the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's

pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule,

must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the

[nonmovant]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

B.     Motion to Dismiss

A motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984). On a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. SEC v. ESM Group, Inc., 835 F.2d 270, 272 (11th Cir. 1988). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-57 (2007)). A complaint must contain enough facts to indicate the presence of the required elements. Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1302 (11th Cir. 2007). "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002). However, a well-pleaded complaint will survive a motion to dismiss "'even if it appears that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

III.    ANALYSIS

A.     "Shotgun" Complaint

As an initial matter, UM argues that this Court should dismiss Andela's Amended Complaint as a shotgun complaint. "The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e. all but the first) contain irrelevant factual allegations and legal conclusions." Strategic Income Fund v. Spear, Leeds & Kellogg, 305 F.3d 1293, 1295 n.9 (11th Cir. 2002). Shotgun complaints impose a heavy burden on the trial court because it must sift

through each and every count to determine which allegations are relevant to the cause of action purportedly stated. United States *ex rel* Atkins v. Mcinteer, 470 F.3d 1350, 1354 (11th Cir. 2006). District courts are encouraged to dismiss such complaints, as permitting such pleadings results in much more judicial labor in the long run. Johnson Ent. of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1333 (11th Cir. 1998); see also Osahar v. U.S. Postal Service, 297 Fed. App'x 863 (11th Cir. 2008) (affirming dismissal of *pro se* shotgun complaint).

While Andela's Amended Complaint could plausibly be characterized as a shotgun complaint, it does not neatly fit under that rubric. Each of Andela's claims in his Amended Complaint incorporate its predecessor claims, but some claims also contain factual allegations corresponding to the stated cause of action. Given the policy of leniency when reviewing *pro se* complaints, this Court deems it proper to review UM and UNC's Motions on the merits rather than dismiss Andela's Amended Complaint as a shotgun complaint.

B.    UM's Request for Summary Judgment to the Extent Res Judicata and Collateral Estoppel Apply

UM moves for summary judgment to the extent Andela's claims are barred by res judicata because they have already been fully litigated before the ALJ and affirmed by the Florida Third Circuit Court of Appeals. UM also argues that collateral estoppel bars any factual allegations Andela makes in his Amended Complaint that are contrary to the issues decided by the ALJ. Andela objects to the application of res judicata and collateral estoppel on the grounds that the ALJ proceedings and Third Circuit affirmance are "null and void" and, therefore, should not be accorded preclusive effect.

The Full Faith and Credit Clause of the of the United States Constitution, codified at 28 U.S.C. § 1738, requires federal courts to grant the same full faith and credit to state court judgments that would be given by other courts of that state. Migra v. Warren City Sch. Dist. Bd.

of Educ., 465 U.S. 75, 81 (1984). "Federal Courts have consistently applied res judicata and collateral estoppel to causes of action and issues decided by state courts." Kremer v. Chem. Const. Corp., 456 U.S. 461, 467 n.6 (1982). "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94 (1980). "Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." Montana v. United States, 440 U.S. 147, 153 (1979). "[R]es judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance in adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." Allen, 449 U.S. at 95-96. In the context of discrimination claims that originate at the administrative level, "a state administrative agency's adjudication of employment discrimination claims, once reviewed and affirmed by a state court, is res judicata for any attempt at later Title VII litigation over the claims raised and those that should have been raised therein." Kremer, 456 U.S. at 485; Crapp v. City of UM Beach, 242 F.3d 1017, 1021 (11th Cir. 2001). This is true so long as: "(1) the courts of that state would be bound by the decision; and (2) the state proceedings that produced the decision comported with the requirements of due process." Maniccia v. Brown, 171 F.3d 1365, 1368 (11th Cir. 1999).

Under Florida law, res judicata applies where there is: "(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons and parties to the action; and (4) identity of the quality [or capacity] of the persons for or against whom the claim is made." The Fla. Bar v. St. Louis, 967 So. 2d 108, 119 (Fla. 2007). Res judicata precludes relitigation of claims that were raised and determined in the original litigation or that could have been properly

raised and determined in the original litigation.  Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co., 945 So. 2d 1216, 1235 (Fla. 2006).  Collateral estoppel applies where: 1) the parties are identical in the initial and subsequent action; 2) the issues are identical in the initial and subsequent action; and 3) the matter has been fully litigated in a court of competent jurisdiction. Dept. of Health & Rehabilitative Servs. v. B.J.M., 656 So. 2d 906, 910 (Fla. 1995).  Both res judicata and collateral estoppel apply to the decisions of an administrative agency where that agency was acting in a judicial capacity and resolved disputed issues of fact before it.  Jet Air Freight v. Jet Air Freight Delivery, Inc., 264 So.2d 35, 40 (Fla. App. 3d Dist. 1972).  Findings of fact by administrative agencies acting in a judicial capacity are given preclusive effect.  See Quinn v. Monroe County, 330 F. 3d 1320 , 1329-33 (11th Cir. 2003).

        1.      Res Judicata and Collateral Estoppel Apply to the Claims and Issues Decided by the ALJ

        a.      Preclusive Effect Under Florida Law

All of the requirements under Florida law for the application of res judicata and collateral estoppel are present.  Andela has sued UM in both his FCHR Complaint and his Amended Complaint.  The ALJ held an evidentiary hearing and allowed both parties to present evidence on their behalf, which they did.  After a full evidentiary hearing on the merits, the ALJ found that Andela's termination was based solely on what were perceived to be his deficiencies as an employee and not on any discriminatory factors.  ALJ Recommended Order at 35, 56-57 (dkt #'s 14-8, 14-9).  The ALJ concluded that "the evidentiary record reveals no act of race or national origin-based discrimination committed by [UM] against [Andela] at any time." Id. at 56.  The ALJ also concluded that Andela "failed to establish any 'casual connection' between the filing of his [FCHR Complaint] . . . and the alleged retaliatory acts enumerated in [Andela's] Petition for Relief." Id. at 60.  The ALJ's findings and conclusions were adopted by the FCHR, the EEOC,

and were reviewed and affirmed by the Florida Third Circuit Court of Appeals. Andela, of course, had the option to pursue his claims by appealing the FCHR's Final Order in state court or by filing suit in federal court based on the EEOC Dismissal and Notice of Rights. "A plaintiff need not seek reversal of an adverse administrative decision through state judicial appeals, but once that course is taken, federal relitigation is foreclosed." Carlisle v. Phenix City Bd. of Educ., 849 F.2d 1376, 1378 (11th Cir. 1988). Andela chose to appeal to the Florida Third District Court of Appeals. Having elected that state court appeal, Andela is now bound by the Third District's affirmance, as is this Court. See Kremer, 456 U.S. at 485. Res judicata, therefore, applies to each of Andela's claims that were brought or could have been brought in the administrative and state proceedings. Collateral estoppel also applies to the all of the issues determined by the ALJ.

> b.   Due Process Considerations

Andela, in effect, concedes that res judicata and collateral estoppel apply by not directly disputing UM's assertion. Andela, instead, argues that the administrative and state proceedings were "null and void." Specifically, Andela argues that the administrative and state proceedings should not be granted preclusive effect because they did not comport with due process and they lacked jurisdiction.

There is no single procedural scheme or model of fairness that is dictated by the Due Process Clause. Kremer, 456 U.S. at 483. The Supreme Court in Kremer upheld an administrative procedural scheme similar to the scheme used in Florida. Id. at 483-85. Florida law requires that claims of employment discrimination be investigated by the FCHR to determine if there is "reasonable cause to believe that discriminatory practice has occurred in violation of the Florida Civil Rights Act of 1992." § 760.11(3), Fla. Stat. If the FCHR determines no reasonable cause exists and dismisses the complaint, the aggrieved person may request an

administrative hearing to be heard by an administrative law judge. Id. § 760.11(7).  Upon request

of an administrative hearing, the parties are then permitted to conduct discovery, submit

evidence, produce witnesses, have witnesses subpoenaed, and examine and cross-examine

witnesses.  §§ 120.569(e-k), 120.57, Fla. Stat.  Once the hearing is concluded, the administrative

law judge issues a recommended order.  § 120.57(k), Fla. Stat.  The parties are then afforded the

opportunity to submit exceptions to the recommended order which the FCHR must rule upon in

its final order adopting, rejecting, or modifying the recommended order.  Id.  All final orders

issued by the FCHR are subject to judicial review.  Id. § 760.11(13).  Florida's procedural

scheme is nearly identical to the scheme upheld in Kremer.  Moreover, where a plaintiff has

received an administrative hearing that was adversarial in nature, then receives additional layers

of administrative review, and finally, is afforded an opportunity for judicial review, there is no

basis to conclude that the state proceedings failed to comport with due process.  Shields v.

Bellsouth Adver. and Pub. Co., Inc., 228 F.3d 1284, 1289 (11th Cir. 2000).

     Here, Andela's claims were investigated by the FCHR who determined that there was no

cause to believe an unlawful employment practice occurred.  Notice of Determination: No Cause

at 2 (dkt # 14-5).  Andela then filed a Petition for Relief requesting a hearing before an ALJ.

Petition for Relief (dkt # 14-6).  Andela was granted a hearing before an ALJ, was permitted to

engage in discovery, and presented evidence and witnesses at the hearing.  ALJ Recommended

Order at 5 (dkt # 14-8).  Andela was given the opportunity to argue his claims for discrimination

and retaliation at the ALJ hearing.  See generally ALJ Recommended Order (dkt #'s 14-8, 14-9).

The ALJ then issued a 64-page Recommended Order.  See ALJ Recommended Order (dkt #'s

14-8, 14-9).  The FCHR held public deliberations on Andela's exceptions to the ALJ's

Recommended Order and ultimately adopted the Order.  Final Order Dismissing Petition for

Relief from an Unlawful Employment Practice at 2 (dkt # 14-10). Andela appealed the FCHR

Final Order to the Florida Third District Court of Appeals who affirmed the FCHR's Order.

Order Affirming, Case No. 3D08-2825, at 2 (Fla. 3d Dist. Ct. App. 2009) (dkt # 14-11). The

EEOC also issued a Dismissal and Notice of Rights in which it adopted the findings of the FCHR

Order. EEOC Dismissal and Notice of Rights at 2 (dkt # 14-12). Accordingly, Andela's due

process right was not violated because he had a full and fair opportunity to litigate his claims in

the administrative proceeding.

      Andela also alleges that the administrative and state proceedings should not be given

preclusive effect because the administrative body lacked jurisdiction over Andela's claims.

However, the affirmance of an administrative determination by a Florida district court of appeals

necessarily involves a determination that the administrative body had jurisdiction over the

plaintiff's claims. <u>Burney v. Polk Cmty. Coll.</u>, 728 F.2d 1374, 1381 (11th Cir. 1984).

Moreover, Andela submitted himself to the jurisdiction of the administrative body. The FCHR,

EEOC, and ALJ clearly had jurisdiction over Andela's discrimination and retaliation claims. <u>See</u>

§§ 760.06, 760.11, Fla. Stat. (FCHR and ALJ jurisdiction); 42 U.S.C. § 2000e-5 (EEOC

jurisdiction).

         2.     Claims 6, 14, 17, 18, 20 & 21 - Claims Alleging Discrimination and
                Retaliation

      Claims 6, 14, 17, 18, 20 and 21 each state claims for discrimination or retaliation. In

Claim 6, Andela alleges that despite receiving a performance review of "exceeds standards" and

working above and beyond regular hours, he "was expressly denied the salary increase and the

faculty position he deserved." Am. Compl. ¶¶ 126-27. While Andela does not expressly allege

this was the result of discrimination, Claim 6 is for violation of Title VII. In Claim 14, violations

of 42 U.S.C. §1981[2] and Title VII, Andela alleges he was terminated in "retaliation for his opposition to unlawful and discriminatory employment practices." Id. ¶ 156. Andela alleges in Claim 17, violation of Title VII, that after UM found out that Andela was pursuing a discrimination charge against them, UM retaliated against him by compelling him to sign a full and general release and withheld certain funds. Id. ¶ 167-68. In Claim 18, violation of Title VII, Andela alleges that UM shut down his student account and "withheld his MAIA practicum report/graduation thesis, final transcript, and diploma" in retaliation for his discrimination charge. Id. ¶ 171. Andela alleges in Claim 20, violation of Title VI, that UM unlawfully discriminated against him "on the [NIH] grant application and the withholding of [Andela's] MAIA transcript and diploma . . . ." Id.      ¶ 177. In Claim 21, violation of Title VII, Andela alleges that UM "plagiarized, falsified, and submitted" his original manuscript for publication to the journal *Cancer Research* in retaliation for his FCHR Complaint. Id. ¶ 179-81.

As noted above, Andela has sued UM in both his FCHR Complaint and the instant Amended Complaint. Each of the above claims were either brought, or could have been brought, by Andela in his administrative and state proceedings. Moreover, the ALJ concluded that "the evidentiary record reveals no act of race or national origin-based discrimination committed by [UM] against [Andela] at any time." Id. at 56. The ALJ also concluded that Andela "failed to establish any 'casual connection' between the filing of his [FCHR Complaint] . . . and the alleged retaliatory acts enumerated in [Andela's] Petition for Relief." Id. at 60. The ALJ's findings and conclusions were adopted by the FCHR, the EEOC, and were reviewed and affirmed by the Florida Third Circuit Court of Appeals. Accordingly, UM is granted summary judgment with

---

[2]Racial employment discrimination and retaliation are actionable under 42 U.S.C. § 1981. Daniels v. Hale, No. 09-10927, 2009 WL 3418586, at * 3 (11th Cir. October 26, 2009). As discussed in this section, the ALJ concluded that no race or national origin based discrimination was committed by UM against Andela at any time. ALJ Recommended Order, UM Mot. Ex. I at 56-57 (dkt # 14-9).

respect to Claims 6, 14, 17, 18, 20, and 21.[3]

        3.      Claims 5 & 19 - Violations of §§ 1 & 2 of Sherman Antitrust Act

In Claim 5, Andela alleges that UM engaged in misrepresentation, fraud, and conspiracy to defraud Andela on the NIH grant application in violation of Sections 1 and 2 of the Sherman Antitrust Act by misrepresenting his role on the project as one of a research assistant/laboratory technician as opposed to a contributing investigator. Am. Compl. ¶¶ 123-124. In Claim 19, Andela alleges that UM violated Section 1 of the Sherman Antitrust Act by withholding his MAIA diploma and his MAIA practicum report/graduation thesis entitled "Constructivism: An International Relations perspective [sic] and a Framework for Enhancing Opportunities for Global Cancer Control." Am. Compl. ¶ 174.

"Section 1 of the Sherman Act prohibits [e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." Texaco, Inc. v. Dagher, 547 U.S. 1, 5 (2006). "Section 2 of the Sherman Act makes it unlawful to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations." Pac. Bell Tel. Co. v. Linkline Commc'ns., Inc., 129 S. Ct. 1109, 1118 (2009) (citation and internal quotation marks omitted). Under both §§ 1 and 2 of the Sherman Act, a plaintiff must allege and prove harm to competition in general, not merely harm to an individual

---

[3]While it is unclear that Claim 21 could have been brought in the ALJ proceeding given the timing of the submittal and publication of the Revised Manuscript, the ALJ nonetheless concluded that Andela himself asked that his name be taken off the Revised Manuscript, and his name was removed before Harrington submitted the Revised Manuscript to *Cancer Research*. This bars Andela from claiming any facts that would support a claim for retaliation with respect to Claim 21.

competitor.[4] <u>Spanish Broad. Sys. of Fla. v. Clear Channel Commc's, Inc.</u>, 376 F.3d 1065, 1069, 1076 (11th Cir. 2004). Antitrust laws were enacted to protect competition, not individual competitors and, therefore, an injury suffered only by an individual competitor may not constitute an antitrust injury. <u>Id.</u> at 1071, 1079.

As an initial matter, the ALJ found that the NIH grant was based on work that had been done prior to Andela's employment with UM. ALJ Recommended Order at 12-13 (dkt # 14-8). The ALJ also found that Andela had not yet received credit for the Practicum in International Administration that he needed to obtain his MAIA degree. <u>Id.</u> at 36. This directly contradicts Andela's allegations. Moreover, Andela lacks standing to sue under the Sherman Act. That UM misrepresented his role in the research project on the NIH grant and withheld his graduate thesis and diploma support only harm to Andela as an individual. Andela has merely couched his alleged personal grievance in the legalese of the Sherman Act in an effort to avail himself of its protections. It is axiomatic that antitrust laws aim to protect competition, not competitors. Accordingly, UM is granted summary judgment with respect to Claims 5 and 19.

      4.        Claim 23 - Violation of 42 U.S.C. §§ 1983 & 1985

In Claim 23, Andela cites 42 U.S.C. §§ 1983 and 1985, but does not make any allegations whatsoever other than to incorporate all of his prior allegations. <u>Id.</u> ¶ 186. In his Response (dkt # 24), Andela does not dispute UM's characterization that his Claim 23 is for discrimination and

---

[4]Section 4 of the Clayton Act gives private plaintiffs standing to sue under the Sherman Act and provides:

> Any person who shall be injured in his business or property by reasons of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including reasonable attorney's fees.

15 U.S.C. § 15(a).

retaliation. Andela simply argues that res judicata and collateral estoppel should not apply because the ALJ and state court affirmance should be considered void. Under § 1983, a plaintiff must show that the defendant acted under color of state law. Gomez v. Toledo, 446 U.S. 635, 640 (1980). UM is a private university. "Only in rare circumstances can a private party be viewed as a [s]tate actor for section 1983 purposes." Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001) (holding UM did not act under color of state law when it terminated an employee). Moreover, when § 1983 is used as a parallel remedy for a Title VII violation, the elements of the two causes of action are the same. Underwood v. Perry County Comm'n, 431 F.3d 788, 793 (11th Cir. 1982). Both require proof of a discriminatory motive or purpose. Id. Similarly, under § 1985, a "plaintiff must allege invidious discriminatory intent on the part of the" defendant. Montford v. Moreno, No. 04-12909, 2005 WL 1369563 (11th Cir. June 9, 2005). It has already been established that UM did not discriminate against Andela at any time. Accordingly, UM is granted summary judgment with respect to Claim 23.

>        **B.**     Remaining Federal Claims Against UM Fail to State a Claim

>                  1.      Claims 16 & 22 - Violations of § 43 of Lanham Act

"The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'" Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28-29 (2003) (citing 15 U.S.C. § 1127). While the Lanham Act primarily addresses trademark protection, § 43 "is one of the few provisions that goes beyond trademark protection." Id. at 29. Section 43 of the Lanham Act creates liability for what is called "passing off" and "reverse passing off." Id. at 28 n.1. False advertising, or "'passing off' occurs when one misrepresents his own goods or services as someone else's and 'reverse passing off' occurs when one misrepresents someone else's goods or

26

services as his own." Id. In Dastar, the Supreme Court refused to extend Lanham Act protection to "a communicative product - one that is valued . . . for the intellectual content that it conveys, such as a book." Id. at 33. The Lanham Act, therefore, does not create a cause of action for plagiarism. See id. at 37 (holding Lanham act applies only to tangible goods offered for sale, not the author of any idea, concept, or communication).

Andela alleges in Claim 16 that Harrington "passed off" the Revised Manuscript by submitting a "mutilated version of Dr. Andela's work to the journal Blood, listing Dr. Andela as the primary author without Dr. Andela's required approval, consent, and signature . . . ." Am. Compl. ¶ 161. In Claim 22, Andela alleges that UM and UNC "reverse passed off" the Revised Manuscript to *Cancer Research* by plagiarizing and submitting his work without his name attributed to the article and without regard to his request that they refrain from doing so. Am. Compl. ¶¶ 183-85. Section 43 of the Lanham Act, however, does not apply to communicative products such as the Revised Manuscript. Dastar, 539 U.S. at 33. Accordingly, Andela's allegations in Counts 16 and 22 fail to state a claim and are dismissed with prejudice.[5]

### 2.    Claim 24 - Violation of RICO Act

In Claim 24, Andela alleges that UM has violated the RICO Act, 18 U.S.C. §§ 1961-1968. Andela has also submitted a Civil RICO Case Statement ("RICO Statement") to support this claim. Local Rule 12.1 provides that "the party filing a RICO claim shall, within thirty days of the filing . . . serve a RICO Case Statement." S.D. Fla. L.R. 12.1. Andela first brought his RICO claim in his Amended Complaint, filed on August 19, 2009. Andela did not serve his RICO Statement until October 1, 2009, thirteen days after it was due. Andela claims that his

---

[5]A district court can dismiss a *pro se* complaint with prejudice if the complaint cannot possibly be amended or more carefully crafted to state a claim. See Bank v. Pitt, 928 F. 2d 1108, 1112 (11th Cir. 1991) Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 n.1 (11th Cir. 2002).

failure to timely file his Civil RICO Case Statement was due to a computer hard drive failure. Pl. Civil RICO Statement at 1 (dkt # 33). Andela, however, never sought an extension of time or leave from this Court in which to file his RICO Statement. Moreover, Andela also fails to state a claim under the RICO statute.

The civil RICO statute provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the Act's criminal prohibitions. 18 U.S.C. § 1964(c). To state a civil RICO claim, a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. Langford v. Rite Aide of Ala., Inc., 231 F.3d 1308, 1311 (11th Cir. 2000). A plaintiff must identify a pattern of racketeering activity by alleging at least two predicate acts of racketeering within a ten year period. Id. "[R]acketeering activity [is] any activity which is indictable under a lengthy list of criminal offenses, including any act or threat involving murder, kidnapping, gambling, arson, robbery, extortion, bribery, mail fraud, wire fraud, counterfeiting, etc." Id. "[T]o survive a motion to dismiss, a plaintiff must allege facts sufficient to support each of the statutory elements for at least two of the pleaded predicate acts." Rogers v. Nacchio, 241 Fed. App'x 602, 607 (11th Cir. 2007). A plaintiff must also plead that the predicate acts "pose a threat of continued criminal activity." Palm Beach County Envt'l Coalition v. Florida, 651 F. Supp. 2d 1328, 1349 (S.D. Fla. 2009).

Andela has not provided any allegations whatsoever in Claim 24. Claim 24 contains one line that incorporates the allegations in the preceding 185 paragraphs of his Amended Complaint. Am. Compl. ¶ 186. In his Response (dkt # 24), Andela makes several references to his RICO Statement. Even if this Court were to construe his RICO Statement as allegations for the purposes of his Amended Complaint, a review of Andela's RICO Statement makes clear that he

28

fails to state a RICO claim. Andela identifies a whole host of alleged predicate acts, some of which are not listed predicate acts under the RICO statute and the rest of which are totally devoid of factual allegations that would support his claims of criminal activity. Andela largely realleges the same grievances he has set forth in his Amended Complaint and has also failed to allege any threat of continued criminal activity. Accordingly, Claim 24 is dismissed with prejudice.

      C.      Federal Claims Against UNC

Andela's Amended Complaint focuses almost entirely on UM but sporadically includes allegations against UNC and UNC employees Dittmer and Dr. Andrea O'Hara ("O'Hara"), individually. Andela's allegations focus primarily on Dittmer, and are centered around Dittmer's questioning of Andela's research and allegations that the laboratory at UNC failed to comply with certain contractual obligations under the NIH grant. UNC moves to dismiss each of Andela's claims for failure to state a claim.[6]

      1.      Claim 11 - Violation of §§ 1 and 2 of Sherman Antitrust Act

In Claim 11, Andela alleges that Dittmer and Dr. Andrea O'Hara, a doctor in Dittmer's lab, "sabotaged [Andela's] research effort," failed to fulfill its contractual obligations by failing to provide certain critical datasets to Harrington's laboratory, and instead, used those datasets to come up with their own research report. Am. Compl. ¶ 141. Andela alleges that those acts amount to "an unlawful restraint of trade and a predatory and exclusionary monopoly geared at stifling [Andela's] competitiveness." Id. Andela's Claim 11 fails for the same reasons as it does against UM as set forth above in subsection (C)(1)(a). Andela cannot allege any injury to competition generally. He merely alleges his own personal grievance. Accordingly, Claim 11 is

---

[6]UNC also requested summary judgment to the extent requested by UM. As UNC was not a party to the earlier proceeding, res judicata and collateral estoppel do not directly apply to UNC.

dismissed with prejudice.

          2.       Claims 16 & 22 - Violation of § 43(a) of the Lanham Act

In Claim 16, Andela alleges that he "suffered economic harm proximately caused by the defendants' conduct in the form of dilution, blurring and tarnishment of his trade dress." Am. Compl. ¶ 164. Andela equates his "trade dress" to his research which was allegedly "falsified and mutilated" in the manuscript which was submitted to *Blood*. Am. Compl. ¶ 161. In Count 22, Andela alleges that "[t]he plagiarism, falsification and publication of Dr. Andela's research work is theft of intellectual property and is not unlike stealing from a commercial business." Am. Compl. ¶ 183.

As noted above, the Supreme Court has made clear that the Lanham Act does not protect "a communicative product - one that is valued . . . for the intellectual content that it conveys, such as a book." Dastar Corp., 539 U.S. at 33. Accordingly, Claims 16 and 22 are dismissed with prejudice.

          3.       Claim 21 - Unlawful Retaliation in Violation of Title VII

As an initial matter, Andela has not contested UNC's Motion with regards to Claim 21. Andela has also failed to make any factual allegations against UNC in Claim 21. Moreover, only an employer can be held liable under Title VII. See 42 U.S.C. § 2000e-2. UNC was not Andela's employer. While some courts have found that Title VII, in some instances, extends to a situation in which a defendant controls, and has interfered with, an individual's employment relationship with a third party, Zaklama v. Mt. Sinai Med. Ctr., 842 F.2d 291, 294 (11th Cir. 1998), Andela has failed to make any allegations that would permit recovery under the Zaklama alternate theory. Andela has also failed to exhaust his administrative remedies as he only filed an EEOC complaint against UM and not UNC. Botelho v. Johanns, No. 09-11072, 2009 WL

3838540, at * 5 (11th Cir. Nov. 18, 2009). Accordingly, Claim 21 is dismissed with prejudice.

4.      Claim 23 - Violation of 42 U.S.C. §§ 1983 and 1985

In Claim 23, Andela makes no allegations other than to incorporate the previous 186 paragraphs of his Amended Complaint. Moreover, Andela does not contest UNC's Motion with respect to Claim 23. On that basis alone, Andela has failed to state a claim. Furthermore, UNC is considered part of the State of North Carolina. Aune v. Univ. of N. Carolina at Chapel Hill, 120 N.C. App. 430, 437 (N.C. App. 1995). The Eleventh Amendment bars suits against a state in federal court absent that state's consent. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984). The State of North Carolina (including its agencies) is not a proper defendant under 42 U.S.C. §§ 1983 and 1985. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989) (holding state is not a proper defendant under § 1983); Eubank v. Leslie, 210 Fed. App'x 837, 844 (11th Cir. 2006) (same); Fincher v. State of Fla. Dept. of Labor and Employment Sec. Unemployment Appeals Comm'n, 798 F.2d 1371, 1372 (11th Cir.) (holding state is not a proper defendant under § 1985); McCreery v. North Carolina, No. 5:01-CV-968-BO(3), 2002 WL 32334399, at *1 (E.D.N.C. May 4, 2002) (holding state of North Carolina and state official sued in their official capacity are immune from § 1983 and § 1985 actions in federal court). Accordingly, Claim 23 is dismissed with prejudice.

D.      Remaining State Law Claims Against UM and UNC

Andela brought this action in federal court upon federal question jurisdiction. He did not make any allegations of diversity jurisdiction. Andela's federal claims against both UM and UNC have been dismissed with prejudice. All that remains are Andela's state law claims against UM and UNC. Pursuant to 28 U.S.C. § 1367(c)(c), a district court may decline to exercise pendent jurisdiction over a claim if "the district court has dismissed all claims over which it has

31

original jurisdiction." 28 U.S.C. § 1367(c)(c). "If all federal law claims in an action have been eliminated before trial and only pendent state law claims remain, the court generally should [dismiss] the case, even though it was originally properly [filed] based upon federal question jurisdiction." <u>Mousa v. Lauda Air Luftfahrt Air, A.G.</u>, 258 F. Supp. 2d 1329, 1347 (S.D. Fla. 2003) (citing <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 349-51 (1988)). Accordingly, the Court declines to exercise pendent jurisdiction over Andela's state law claims.

## IV.   CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED as follows:

1. Summary judgment is GRANTED in favor of UM with respect to Claims 5, 6, 14, 17, 18, 19, 20, 21 & 23.

2. UM's Motion to Dismiss is GRANTED IN PART. Claims 16, 22 & 24 are DISMISSED WITH PREJUDICE.

3. UNC's Motion to Dismiss is GRANTED IN PART. Claims 11, 16, 21, 22 & 23 are DISMISSED WITH PREJUDICE.

4. The Court declines to exercise pendent jurisdiction over Andela's state law claims against both UM and UNC. Claims 1, 2, 3, 4, 7, 8, 9, 10, 12, 13 & 15 are hereby DISMISSED.

5. The Clerk of the Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 8*th* day of March, 2010.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

Valentine B. Andela, *pro se*
924 Garrett, # 404
Upper Darby, PA 19082